**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| John Tarr, | : | Case No. 3:12 CV 1090 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **MEMORANDUM AND** |
| Defendant, | : | **ORDER** |

## I. INTRODUCTION

Plaintiff John Tarr ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(i), and 423 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 17 and 18)

and Plaintiff's Reply (Docket No. 19). For the reasons that follow, the opinion of the Commissioner is

affirmed in part and remanded in part.

## II. PROCEDURAL BACKGROUND

1

On March 15, 2005, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 12, pp. 72-74 of 530). In his application,

Plaintiff alleged a period of disability beginning June 1, 2003 (Docket No. 12, p. 72 of 530). Plaintiff's

claim was denied initially on May 23, 2005 (Docket No. 12, pp. 62-64 of 530), and upon

reconsideration on September 22, 2005 (Docket No. 12, pp. 40-42 of 530). Plaintiff thereafter filed a

timely written request for a hearing on September 30, 2005 (Docket No. 12, p. 38 of 530).

On December 17, 2007, Plaintiff appeared with counsel for a hearing before Administrative

Law Judge Dennis R. Greene ("ALJ Greene") (Docket No. 12, pp. 367-416 of 530). Also appearing at

the hearing were medical experts Dr. Walter Miller ("Dr. Miller") (Docket No. 12, pp. 393-95 of 530)

and Dr. Kathleen O'Brien ("Dr. O'Brien") (Docket No. 12, pp. 395-404 of 530), and an impartial

Vocational Expert ("VE") (Docket No. 12, pp. 404-14 of 530). ALJ Greene found Plaintiff to have a

severe combination of tinnitus,[1] hearing loss, and depression with an onset date of June 1, 2003

(Docket No. 12, p. 16 of 530).

Despite these limitations, ALJ Greene determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of his decision (Docket No. 12, p. 20 of 530). ALJ Greene found

Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels

with the following limitations: (1) no concentrated exposure to noise (2) no climbing of ladders, ramps,

or scaffolding; and (3) would perform best in a quiet setting with minimal distractions and limited

contact with others (Docket No. 12, p. 17 of 530). ALJ Green found Plaintiff unable to perform his

---

[1] A subjective ringing, buzzing, tinkling, or hissing sound in the ear. For some patients, this causes only minor irritation; for others, it is disabling. TABER'S MEDICAL CYCLOPEDIC DICTIONARY (2011).

2

past relevant work, but able to perform other jobs in the national economy (Docket No. 12, p. 19 of

530). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 20 of 530).

On December 31, 2008, Plaintiff, acting *pro se*, filed a Complaint in the Northern District of

Ohio, Western Division, seeking judicial review of his denial of DIB.[2] On October 9, 2009, the parties

filed a Joint Stipulation to Remand to the Commissioner which was issued via Order by Judge Zouhary

(Docket No. 12, p. 457 of 530).[3] The Stipulation ordered the Appeals Council to remand the case to an

ALJ to

> consider the medical source opinions of record and articulate the weight accorded to this
> evidence. The ALJ will also obtain any additional evidence from Dr. Thombre, Plaintiff's
> treating psychiatrist, and any other evidence relevant to the issue of disability prior to
> Plaintiff's date last insured. The ALJ will also consider the effect of Plaintiff's subjective
> symptoms, such as tinnitus, as required under the regulations.

 (Docket No. 12, p. 458 of 530). On October 19, 2009, the Appeals Council vacated the final decision

of the Commissioner and remanded Plaintiff's case to an ALJ for further proceedings (Docket No. 12,

p. 463 of 530).

On June 3, 2010, Plaintiff appeared with new counsel Steven Koder for a hearing before ALJ

Deirdre Horton ("ALJ Horton") (Docket No. 12, pp. 501-30 of 530). No other experts appeared at the

hearing (Docket No. 12, pp. 301-30 of 530). In an August 25, 2010, decision, ALJ Horton found

Plaintiff to have a severe combination of tinnitus, partial hearing loss, and depression with an onset

date of June 1, 2003 (Docket No. 12, p. 447 of 530).

Despite these limitations, ALJ Horton, like ALJ Greene, determined, based on all the evidence

presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any

---

[2] This Complaint was filed under Docket No. 3:08-cv-03039.

[3] *See also* Judgment, *Tarr v. Astrue*, No. 3:08cv3039 (N.D. Ohio Oct. 8, 2009) (Docket No. 18).

time from the alleged onset date through his last insured date of December 31, 2007 (Docket No. 12, p. 447 of 530). ALJ Horton found Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but noted that Plaintiff must avoid concentrated exposure to noise and refrain from climbing ladders, ramps, or scaffolding (Docket No. 12, p. 448 of 530). ALJ Horton also noted that Plaintiff would perform best in a quiet setting with minimal distractions and contact with others (Docket No. 12, p. 448 of 530). Like ALJ Greene, ALJ Horton found Plaintiff unable to perform any past relevant work, but able to perform other work in the national economy (Docket No. 12, p. 449 of 530). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 450 of 530).

On May 2, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of his denial of DIB (Docket No. 1). In his pleading, Plaintiff alleged that the ALJ failed to properly: (1) apply the treating physician rule; and (2) determine Plaintiff's credibility (Docket No. 17, p. 2 of 22). Defendant filed its Answer on July 19, 2012 (Docket No. 10).

### III.  FACTUAL BACKGROUND

#### A.    FIRST ADMINISTRATIVE HEARING

An administrative hearing convened on September 30, 2005 (Docket No. 12, pp. 367-416 of 530). Plaintiff, represented by counsel William Higley, appeared and testified via video (Docket No. 12, pp. 370-91 of 530). Also present and testifying were medical experts Drs. Miller and O'Brien (Docket No. 12, pp. 391-404) and VE Joseph Thompson ("VE Thompson") (Docket No. 12, pp. 404-14 of 530).

#### 1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a forty-six year old male who resided with his wife and father-in-law (Docket No. 12, p. 371 of 530). Plaintiff stated that he graduated from high school and

4

completed three of the required four years of an automotive repair program at Mo-Tech Automotive Education Center, failing to complete only his apprenticeship (Docket No. 12, pp. 371-72 of 530). During this hearing, Plaintiff made mention, but provided no detail, of an injury which sparked his tinnitus and subsequent depression (Docket No. 12, p. 375 of 530). Plaintiff indicated that he ultimately received a settlement in the amount of $150,000, of which he personally received $94,000, sometime in 2006 (Docket No. 12, pp. 376, 383-84 of 530).

With regard to his past employment, Plaintiff indicated that he worked at Ford Motor Company as a prototype technician, at Dana Corporation testing automobile parts, and for Tolson and Kelly Homes as an independent contractor (Docket No. 12, pp. 372-76 of 530). When asked by the VE, Plaintiff indicated that he also had experience as a packaging supervisor, plant manager, and material handler (Docket No. 12, p. 378 of 530). Plaintiff testified that he last worked some time in 2003 (Docket No. 12, p. 375 of 530). Plaintiff also stated that he had a "small cheese booth . . . at the trade center," but indicated that his mother was in charge (Docket No. 12, p. 373 of 530). He testified that the booth sometimes failed to make rent (Docket No. 12, p. 373 of 530).

Plaintiff gave testimony concerning a number of his alleged impairments, including his tinnitus and depression (Docket No. 12, pp. 380-91 of 530). With regard to the tinnitus, Plaintiff stated that the ringing in his ears can get so loud it is sometimes deafening (Docket No. 12, p. 390 of 530). Plaintiff also indicated that the ringing is worse in his left ear and is constant (Docket No. 12, pp. 390-91 of 530). The ringing gets worse approximately ten times per month and Plaintiff stated that, during these times, he cannot hear at all (Docket No. 12, p. 391 of 530). Plaintiff's wife has to sit on his right side so Plaintiff can hear her (Docket No. 12, p. 390 of 530).

With regard to his depression, Plaintiff stated that he has difficulty focusing and concentrating

5

and suffers from insomnia and a lack of motivation (Docket No. 12, pp. 380, 386 of 530). Plaintiff

claimed he isolated himself and withdrew from all social activities once the tinnitus set in and suffers

from feelings of guilt, worthlessness, and irritability (Docket No. 12, pp. 387-89 of 530). When asked,

Plaintiff indicated that he could help with some household chores (Docket No. 12, p. 389 of 530). In

addition to his psychiatrist, Plaintiff testified that he also saw a therapist, Linda Loesch ("Ms. Loesch")

(Docket No. 12, p. 382 of 530). Plaintiff's sessions with Ms. Loesch were one to two and a half hours

long (Docket No. 12, p. 382 of 530). According to Plaintiff, however, Ms. Loesch did not help him as

much as he would have liked (Docket No. 12, p. 383 of 530). Plaintiff stated that he eventually had to

limit the frequency of his sessions because of the cost (Docket No. 12, p. 383 of 530).

### 2. TESTIMONY OF DR. MILLER, MEDICAL EXPERT

Dr. Miller testified that, although Plaintiff complained of tinnitus, the ringing in Plaintiff's ears

was not accompanied by the additional symptoms, required under 20 C.F.R. § 404, Subpart P,

Appendix 1, § 2.07, necessary to find a disability (Docket No. 12, pp. 393-94). These additional

symptoms include frequent attacks of balance and disturbance and progressive loss of hearing,

established by audiometry (Docket No. 12, p. 393 of 530). Based on his review, Dr. Miller opined that

Plaintiff was capable of light work (Docket No. 12, p. 394 of 530).

### 3. TESTIMONY OF DR. O'BRIEN, MEDICAL EXPERT

Dr. O'Brien, a licensed psychologist, testified that Plaintiff suffered from some level of anxiety

and depression (Docket No. 12, p. 397 of 530). Based on her review of Plaintiff's medical record,

especially those records from Ms. Loesch, Dr. O'Brien stated that Plaintiff's anxiety and depression

were not severe and the limitations presented during a mental residual functional capacity assessment

demonstrated only mild restrictions (Docket No. 12, p. 397 of 530). Dr. O'Brien went on to state

6

[Plaintiff is] able to do household chores. He can do dishes, He can do vacuuming. There are a number of other notations in his record that suggest that he's able to go antiquing or to garage sales. He reports going fishing. He's able to make purchases and handle money. He – in the time he's being treated he bought a new car. There's references to opening up stores, buying distributorships. I would say that he would certainly be capable of most tasks that would be involved in the average work. Given that he reports some symptoms, it probably would be a good idea for him to be engaged in tasks that didn't require high productivity but there doesn't seem to be anything wrong with him cognitively . . . ."

(Docket No. 12, p. 398 of 530).

### 4.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a material handler as heavy and semi-skilled, a lab technician as light and skilled, a packaging supervisor as light and skilled, a plant manager as light, and his warranty position as medium and skilled (Docket No. 12, pp. 405-06 of 530).

ALJ Greene then posed his first hypothetical question:

Given a hypothetical person of the claimant's age, education and work history if I were to apply Exhibit 5F to that person what would your professional opinion be on that person's ability to engage in substantial gainful activity?

(Docket No. 12, p. 406 of 530).[4] Taking into account these limitations, the VE testified that such an individual would be able to perform the warranty position, the material handler position, and the lab technician position (Docket No. 12, p. 408 of 530). The VE stated that there was other work that the hypothetical person could perform at the medium level, including: (1) assembler, for which there are 15,000 positions locally; (2) packager, for which there are 12,000 positions locally; and (3) janitor, for

---

[4] Exhibit 5F is a Physical Residual Functional Capacity Assessment conducted by state examiner Dr. Robert E. Norris ("Dr. Norris") on May 17, 2005 (Docket No. 12, pp. 195-202 of 530). Dr. Norris found that Plaintiff suffered from *no* exertional, manipulative, visual, or communicative limitations (Docket No. 12, pp. 195-99 of 530). Dr. Norris opined that Plaintiff should *never* climb ladders, ropes, or scaffolds, should avoid concentrated exposure to noise, and all exposure to hazards such as machinery and heights (Docket No. 12, pp. 197, 199 of 530).

which there are 15,000 positions locally (Docket No. 12, p. 408 of 530). The VE indicated that these jobs would still be available at the light exertional level, but in reduced numbers (Docket No. 12, p. 408 of 530).[5] At the sedentary level, other available work would include bench worker, brake lining coder, and hand mounter, for which there 250 positions locally (Docket No. 12, p. 409 of 530).

ALJ Greene then added to his hypothetical, stating "if I were to add to perform optimally in a quiet setting with minimal distractions and limited contact with others would that change any of your prior statements" (Docket No. 12, p. 409 of 530). VE Thompson indicated that the additional limitation would eliminate the assembly and packaging positions, but would add the medium-exertion positions of: (1) kitchen helper, for which there are 4,000 positions locally; (2) industrial cleaner, for which there are 5,000 positions locally; and (3) hospital cleaner, for which there are 1,000 positions locally (Docket No. 12, p. 409 of 530). At the light level, VE Thompson stated that other positions included: (1) folder, for which there are 1,000 positions locally; and (2) food preparation, for which there are 2,500 positions locally (Docket No. 12, p. 410 of 530). There would be no positions available at the sedentary level (Docket No. 12, p. 410 of 530).

ALJ Greene's third hypothetical involved Exhibit 10F, which is a Psychiatric Review Technique performed by Plaintiff's treating psychiatrist, Dr. Melanie Thombre ("Dr. Thombre") on May 29, 2007, in which she found Plaintiff to have marked difficulties in maintaining social functioning and concentration, persistence, and pace (Docket No. 12, p. 264 of 530). Based on these findings, plus the indication that the individual would be absent five or more days per month, the VE found that all other employment possibilities were eliminated (Docket No. 12, p. 411 of 530).

During cross-examination, Plaintiff's counsel questioned whether "the inability to concentrate .

_____

[5] These numbers are 10,000, 3,000, and 1,500, respectively (Docket No. 12, p. 408 of 530).

. . because of ringing in the ears, inability to concentrate or focus even minimally on a task that certainly would have an impact on the person's ability to function in a work setting" (Docket No. 12, p. 412 of 530). The VE responded in the positive, stating that if these limitations were to prohibit the hypothetical individual from performing one-two step tasks, employability would be affected (Docket No. 12, p. 412 of 530). VE Thompson also testified, when prompted, about the normal attendance expected of an employee, which he stated included no more than one or two absences per month (Docket No. 12, p. 413 of 530). The VE also indicated that with production-focused jobs, industry standards required an individual to maintain a certain level of productivity (Docket No. 12, p. 414 of 530).

**B.**    **SECOND ADMINISTRATIVE HEARING**

A second administrative hearing convened on June 3, 2010, on order from the United States District Court (Docket No. 12, p. 502 of 530). Plaintiff, with new counsel, appeared and testified via video (Docket No. 12, p. 503 of 530).

**1.**    **PLAINTIFF TESTIMONY**

At the time of the hearing, Plaintiff was forty-eight years old and in the process of moving out of his father-in-law's house with his wife and sixteen-month old daughter (Docket No. 12, p. 507 of 530). Plaintiff indicated that he could drive, but stated that he could not ride in the back seat of a car because he became nauseous (Docket No. 12, p. 508 of 530). Plaintiff testified that his wife worked while he stayed home with their daughter (Docket No. 12, p. 509 of 530).

Plaintiff relayed the story of how his hearing problems and tinnitus began, stating "it was a plane flight. There was something wrong with the engines on the plane and there were gaps in the wall where I was sitting that the noise was so loud that it caused me to lose my hearing" (Docket No. 12, p.

9

527 of 530). Plaintiff indicated he regained some, but not all, of his hearing approximately one week after the flight (Docket No. 12, p. 527 of 530). When asked by the ALJ if he was having difficulty hearing during the proceeding, Plaintiff stated, "I can hear you, Your Honor. You're a little muffled. I can hear you though. I do have more of a hearing loss in my left ear than my right. So, I can still hear you" (Docket No. 12, p. 527 of 530).

Given that his wife worked, Plaintiff's counsel inquired as to whether Plaintiff watched the couples' daughter regularly (Docket No. 12, p. 509 of 530). Plaintiff responded in the negative, indicating that he had a "large support system" that he relied on every day, consisting of his parents and sister, father-in-law and others who helped watch his daughter, given Plaintiff's need to rest during the day (Docket No. 12, pp. 509, 520 of 530). When asked about his daily activities, Plaintiff indicated that he could not do anything that caused stress for him, otherwise he would have to sit or lie down (Docket No. 12, p. 519 of 530). Plaintiff testified that his wife usually goes to the grocery store and that, if he goes, he cannot spend more than fifteen or twenty minutes in the store because it is "not good for [his] stress level" (Docket No. 12, p. 521 of 530).

Plaintiff again testified about his medical conditions. With regard to his tinnitus, Plaintiff indicated that he still suffered from loud, severe ringing in his ears that does not subside (Docket No. 12, p. 510 of 530). Plaintiff testified that the ringing is accompanied by balance difficulties, which have gotten worse over time (Docket No. 12, pp. 510-11 of 530). The tinnitus causes pain, especially in Plaintiff's left ear, which Plaintiff described as "shooting pains" which could last up to two minutes (Docket No. 12, pp. 516, 528 of 530). Plaintiff testified that he has tried a hearing aid, but stated that the device just makes the ringing worse because "it magnified everything around [him] and gave [him] a headache and it just made [his] tinnitus worse" (Docket No. 12, pp. 516-17 of 530).

10

Plaintiff also stated that the tinnitus led him to develop depression, for which he was treated by Dr. Thombre beginning in 2003 (Docket No. 12, p. 511 of 530).[6] Plaintiff testified that Dr. Thombre diagnosed him with depression, anxiety, and post traumatic stress disorder ("PTSD") (Docket No. 12, p. 512 of 530). According to Plaintiff, Dr. Thombre stated that Plaintiff has "tried every medication available for depression and really none of them have worked" (Docket No. 12, p. 512 of 530).

Plaintiff also testified about his difficulty sleeping, stating that he becomes very restless during the night because of the ringing in his ears (Docket No. 12, p. 513 of 530). He also indicated that he avoids activities that involve any amount of noise, such as firework shows, concerts, and restaurants (Docket No. 12, pp. 513-14 of 530). According to Plaintiff, he left Dr. Thombre's care because it was too expensive (Docket No. 12, p. 517 of 530).

With regard to his residual functional capacity, Plaintiff testified that he could lift and carry less than ten pounds because of his balance problems (Docket No. 12, p. 521 of 530). He stated that he is afraid to lift his daughter, who weighs twenty pounds (Docket No. 12, p. 522 of 530). Plaintiff also indicated that he has trouble standing and walking because of his balance and equilibrium problems (Docket No. 12, p. 522 of 530). Plaintiff testified that he stumbles in the shower, but can use stairs as long as he has something to hold on to (Docket No. 12, p. 523 of 530). Plaintiff also mentioned a recent onset of blurred vision, which he testified happens daily (Docket No. 12, pp. 523-24 of 530).

## C.   MEDICAL RECORDS

### 1.   PHYSICAL HEALTH ISSUES

Plaintiff's medical records date back to February 5, 2003, when Plaintiff saw Dr. Kenneth R.

---

[6] Plaintiff's counsel originally mentions a Dr. Melanie Umbra, but later discusses a Dr. Thombre (Docket No. 12, pp. 511-30 of 530). Based on the context of counsel's questioning, this Magistrate assumes that Plaintiff's counsel was referring, at all times, to Plaintiff's primary treating psychiatrist, Dr. Thombre.

Bertka ("Dr. Bertka") after reportedly experiencing a "very loud unusual noise" on an airplane which left him with ringing, irritation, and hearing loss in his left ear (Docket No. 12, p. 159 of 530). Dr. Bertka noted that Plaintiff had slight redness of his tympanic membrane[7] but a completely normal exam of his right ear (Docket No. 12, p. 159 of 530). Dr. Bertka suggested Plaintiff avoid all loud noise for several weeks (Docket No. 12, p. 159 of 530). Plaintiff returned to Dr. Bertka on February 25, 2003, complaining that his symptoms were unchanged (Docket No. 12, p. 159 of 530). Both of Plaintiff's tympanic membrane's were normal upon examination (Docket No. 12, p. 159 of 530).

On March 19, 2003, Plaintiff was referred to ear, nose, and throat specialist Dr. Larry K. Winegar, MD ("Dr. Winegar") (Docket No. 12, p. 169 of 530). Plaintiff complained of continued hearing loss in his left ear and decreased sleep due to tinnitus (Docket No. 12, p. 169 of 530). Dr. Winegar opined that Plaintiff had left-sided high frequency hearing loss compatible with some type of noise exposure, but noted that Plaintiff's auditory canals and tympanic membranes were normal in appearance, as were the results of a Weber tuning fork test[8] and Rinne test[9] (Docket No. 12, pp. 169-170 of 530).

Plaintiff returned to Dr. Bertka on May 5, 2003, complaining that the ringing in his ears was getting worse and was now accompanied by headaches (Docket No. 12, p. 158 of 530). Dr. Bertka was "concerned that there are a lot of symptoms and [the] symptoms that are still appearing are progressing, that seem out of

---

[7] The eardrum. The membrane which separates the external ear canal . . . from the deeper part of the ear known as the middle ear. It is composed of three layers. The outer layer is skin-like; the middle layer is composed of fibrous tissue; the inner layer, the one facing the middle ear, is made of mucous membrane. ATTORNEYS' DICTIONARY OF MEDICINE, T-119691.

[8] A hearing test to differentiate between deafness caused by a disorder in the middle ear or disorder of the auditory nerve. A vibrating tuning fork is placed in the midline of the forehead and the patient is asked if he . . . can hear the sound better in either ear. Normally, the sound is heard equally well in both ears. If the sound is heard better in the affected or deaf ear, the impairment is due to defective conduction in the middle ear. If the sound is heard better in the good ear, the deafness in the affected ear is caused by a disorder of the auditory nerve. ATTORNEYS' DICTIONARY OF MEDICINE, W-124568.

[9] A hearing test in which a vibrating tuning fork is placed over the mastoid bone (behind the ear), to test bone conduction, and the patient is asked to say at once when he no longer hears the sound. Then the fork is immediately held beside the ear tested (air conduction). Normally the patient can still hear a faint sound by air conduction. ATTORNEYS' DICTIONARY OF MEDICINE, R-102148.

proportion to the suspected initiation cause of an airplane ride that was noisy" (Docket No. 12, p. 158 of 530).

On June 16, 2003, Plaintiff had a normal exam with Dr. Winegar, his auditory canals and tympanic membranes normal in appearance (Docket No. 12, p. 168 of 530). Dr. Winegar diagnosed Plaintiff with subjective tinnitus and difficulty hearing (Docket No. 12, p. 168 of 530). Plaintiff did not return to Dr. Winegar until November 20, 2003, when he presented with a nasal blockage and difficulty breathing (Docket No. 12, p. 166 of 530). At that time, Dr. Winegar noted that Plaintiff wore a hearing aid in his *right* ear (Docket No. 12, p. 166 of 530).

Plaintiff's medical records then jump to February 4, 2005, when Plaintiff saw Dr. Peter J. VanderMeer, MD ("Dr. VanderMeer") (Docket No. 12, p. 165 of 530). Plaintiff complained of bilateral hearing loss, noting that it was worse in his left ear, and high-pitched tinnitus (Docket No. 12, p. 165 of 530). Plaintiff also stated that he had sharp shooting pains that alternated with dull pains which kept him up at night (Docket No. 12, p. 165 of 530). During this appointment, Dr. VanderMeer noted that Plaintiff was wearing a hearing aid in his *left* ear (Docket No. 12, p. 165 of 530). An audio test revealed that Plaintiff had normal hearing in his right ear and mild high frequency sensoineural hearing loss[10] in his left ear (Docket No. 12, p. 165 of 530). Dr. VanderMeer recommended continued use of the hearing aid in Plaintiff's left ear and suggested Plaintiff repeat the audio test in two years (Docket No. 12, p. 165 of 530).

### 2. MENTAL HEALTH ISSUES

Plaintiff's record includes mental health notes from both Ms. Loesch and Dr. Thombre (Docket No. 12, pp. 222-44, 274-316 of 530). On July 15, 2003, Ms. Loesch diagnosed Plaintiff with PTSD, depression, anxiety, and obsessive compulsive tendencies as a result of his ear injury (Docket No. 12, p. 243 of 530). She also assigned Plaintiff a Global Assessment of Functioning score of forty-eight (Docket No. 12, p. 243 of 530).[11] Plaintiff saw Ms. Loesch approximately every two weeks until April 2007,

---

[10] The test revealed that Plaintiff had a ten to fifteen percent loss (Docket No. 12, p. 165 of 530).

[11] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score

although his sessions did taper off towards the end of that time period (Docket No. 12, pp. 222-44). Ms. Loesch's notes indicate that Plaintiff had both good times and bad, but stated that Plaintiff was especially preoccupied with his legal battles (Docket No. 12, pp. 222-44). Beginning in 2005, Ms. Loesch began encouraging Plaintiff to become more active (Docket No. 12, pp. 222-28). In June 2006, Ms. Loesch noted that Plaintiff was doing better, had bought a boat, and was fishing (Docket No. 12, p. 224 of 530). In Plaintiff's last appointment with Ms. Loesch on April 19, 2007, she noted that Plaintiff was "disgruntled" and encouraged him to find things that would keep him "positively occupied" (Docket No. 12, p. 222 of 530).

Plaintiff also saw his psychiatrist, Dr. Thombre, during this same time period (Docket No. 12, pp. 274-310 of 530). Dr. Thombre started Plaintiff on Welbutrin on December 2, 2003 (Docket No. 12, p. 309 of 530). Over the next few years, Plaintiff went through multiple medication changes, including Cymbalta and Prozac, sometimes repeating the same medication after several months on a different medication (Docket No. 12, pp. 274-310 of 530). Plaintiff engaged both in individual and couples' therapy with Dr. Thombre until September 25, 2007 (Docket No. 12, pp. 274-310 of 530).

During her initial psychiatric evaluation, Dr. Thombre noted that Plaintiff complained of depression, difficulty sleeping and concentrating, withdrawal, and decreased libido (Docket No. 12, pp. 188-89 of 530). Dr. Thombre found that Plaintiff displayed good insight and judgment, was warm, and established a good rapport (Docket No. 12, p. 190 of 530). She diagnosed Plaintiff with severe depression, likely precipitated by his tinnitus (Docket No. 12, p. 190 of 530). Dr. Thombre's session notes did not go into much detail with regard to Plaintiff's progress, basically noting when Plaintiff was doing well and when he was not (Docket No. 12, pp. 274-310 of 530).

## C. EVALUATIONS

### 1. PSYCHIATRIC REVIEW TECHNIQUE

---

of 48 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

On May 16, 2005, Plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Caroline T. Lewin, Ph.D ("Dr. Lewin") (Docket No. 12, pp. 203-16 of 530). Dr. Lewin noted that Plaintiff suffered from secondary depression and anxiety with PTSD (Docket No. 12, p. 208 of 530). In assessing "Paragraph B"[12] criteria, Dr. Lewin found Plaintiff to have a mild degree of limitation with regard to his activities of daily living and moderate difficulty in maintaining social functioning as well as concentration, persistence, and pace (Docket No. 12, p. 213 of 530). Dr. Lewin found no episodes of decompensation or the presence of "Paragraph C"[13] criteria (Docket No. 12, pp. 213-14 of 530).

## 2.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On that same day, Dr. Lewin also completed a Mental Residual Functional Capacity Assessment of Plaintiff (Docket No. 12, pp. 217-20 of 530). Dr. Lewin found Plaintiff to be moderately limited in several categories, including his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; and (7) accept instructions and respond appropriately to criticism from supervisors (Docket No. 12, pp. 217-18 of 530).

## 3.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner

---

[12] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[13] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

Dr. Robert E. Norris, MD ("Dr. Norris") on May 17, 2005 (Docket No. 12, pp. 195-202 of 530). Dr. Norris determined that Plaintiff had no exertional, manipulative, visual, or communicative limitations (Docket No. 12, pp. 196-99 of 530). Dr. Norris opined that Plaintiff should never climb ladders, ropes, or scaffolds, should avoid concentrated exposure to noise, and should avoid all exposure to hazards like machinery and heights (Docket No. 12, pp. 197-99 of 530).

### 4.     MEDICAL REPORT

Sometime after August 3, 2005, Dr. Thombre completed two medical report evaluations of Plaintiff at the request of the Bureau of Disability Determination ("BDD") concerning her records of Plaintiff from November 4, 2003, through July 22, 2005 (Docket No. 12, pp. 175-87 of 530). Dr. Thombre noted that Plaintiff was irritable and depressed and suffered from low energy, decreased hearing, and preoccupied thoughts as a result of his tinnitus (Docket No. 12, pp. 176, 178 of 530). The doctor also reported that Plaintiff was socially withdrawn, avoiding conversation with others, and had difficulty sleeping (Docket No. 12, pp. 176, 178 of 530). Noting that Plaintiff's mental health symptoms began after the original injury in 2003, Dr. Thombre reported that Plaintiff was compliant with his medication and appointments, although she stated that anti-depressants were not working (Docket No. 12, pp. 177, 179 of 530). Dr. Thombre diagnosed Plaintiff with secondary depression and anxiety consistent with PTSD and depressed mood (moderate) (Docket No. 12, pp. 177, 179 of 530).

### 5.     PSYCHIATRIC REVIEW TECHNIQUE

On May 29, 2007, Plaintiff underwent a second Psychiatric Review Technique, this time with Dr. Thombre (Docket No. 12, pp. 254-67 of 530). Dr. Thombre found that Plaintiff suffered from: (1) disturbance of mood, accompanied by a full or partial manic depressive syndrome; (2) generalized persistent anxiety; (3) persistent irrational fear of a specific object, activity, or situation which results

16

in a desire to avoid the object, activity, or situation; and (4) a recurrent and intrusive recollection of a traumatic experience (Docket No. 12, pp. 257-59 of 530). The doctor reported that Plaintiff had moderate restriction of activities of daily living and marked limitations in maintaining social functioning as well as concentration, persistence, and pace (Docket No. 12, p. 264 of 530). Dr. Thombre did not indicate whether Plaintiff suffered from episodes of decompensation, but rather wrote "ongoing" next to the limitation with a question mark (Docket No. 12, p. 264 of 530).

### 6. ASSESSMENT OF WORK-RELATED LIMITATIONS (MENTAL)

On that same day, Dr. Thombre completed an assessment of Plaintiff's work-related mental limitations (Docket No. 12, pp. 268-72 of 530). Dr. Thombre concluded that Plaintiff had mild limitations with regard to his ability to: (1) use judgment; (2) interact appropriately with supervisor(s); (3) understand, remember, and carry out detailed, but not complex, job instructions; (4) demonstrate reliability; and (5) maintain socially appropriate behavior (Docket No. 12, pp. 268-70 of 530). Plaintiff had moderate limitation with regard to his ability to: (1) follow work rules; (2) relate to co-workers; (3) deal with the public; (4) respond appropriately to usual work siuations and to changes in a routine work setting; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) understand, remember, and carry out complex job instructions; (8) behave in an emotionally stable manner; and (9) relate predictably in social situations (Docket No. 12, pp. 268-70 of 530). Dr. Thombre found Plaintiff had marked limitation with regard to his ability to: (1) deal with day-to-day work stresses; (2) maintain attention/concentration for extended periods; (3) complete a normal workweek without interruptions from psychologically-based symptoms; and (4) work in coordination with or proximity to others without being distracted by them (Docket No. 12, pp. 269-71

17

of 530). Based on these findings, Dr. Thombre concluded that Plaintiff would be absent from work five or more days per month, making him an unreliable worker (Docket No. 12, p. 272 of 530).

### 7. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a second Physical Residual Functional Capacity Assessment with his own physician, Dr. Walter Woodhouse, MD ("Dr. Woodhouse") on June 1, 2010 (Docket No. 12, pp. 494-98 of 530). Dr. Woodhouse opined that Plaintiff could occasionally: (1) lift/carry less than ten pounds; (2) climb ramps, stairs, and ladders; and (3) kneel, crouch, crawl, or stoop (Docket No. 12, pp. 494, 496 of 530). Plaintiff was limited in his ability to push/pull, reach, see, and hear (Docket No. 12, pp. 495-96 of 530). Dr. Woodhouse reported that Plaintiff could never balance, could only stand/walk for two hours during an eight-hour workday, must periodically alternate between sitting and standing, must take unscheduled work breaks, and spend part of each day lying down (Docket No. 12, pp. 495-97 of 530).

Based on these findings, Dr. Woodhouse opined that Plaintiff would likely be absent from work four or more days per month and was incapable of engaging in even a low stress work environment (Docket No. 12, pp. 497-98 of 530).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996

19

SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Horton made the following findings:[14]

1. Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2007.

2. Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of June 1, 2003, through his date last insured of December 31, 2007.

3. Through the date last insured, Plaintiff had the following severe impairments: tinnitus, partial hearing loss, and depression. It is noted that Plaintiff's depression barely met the *de minimus* standard of severity under the regulations.

---

[14] It should be noted that ALJ Horton is bound by the previous decision of ALJ Greene. It is well-documented in the Sixth Circuit that, "absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); *see also* 42 U.S.C. § 405(h).

20

6.      Through the date last insured, Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7.      Through the date last insured, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following limitations: (1) Plaintiff must avoid concentrated exposure to noise; (2) Plaintiff should not climb ladders, ramps, or scaffolds; and (3) Plaintiff would perform best in a quiet setting with minimal distractions and contact with others.

8.      Through the date last insured, Plaintiff was unable to perform any past relevant work.

9.      Plaintiff was born on August 18, 1961, and was 46 years old, which is defined as a younger individual age 18-49 on the date last insured.

10.     Plaintiff has at least a high school education and is able to communicate in English.

11.     Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

12.     Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

13.     Plaintiff was not under a disability, as defined in the Social Security Act, at any time from June 1, 2003, the alleged onset date, through December 31, 2007, the date last insured.

(Docket No. 12, pp. 447-49 of 530). ALJ Horton denied Plaintiff's request for DIB (Docket No. 12, p. 450 of 530).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

21

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because

there is a 'zone of choice' within which the Commissioner can act, without the fear of court

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.

2001) (citations omitted)).

## VII. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges that the ALJ failed to follow the treating physician

rule and failed to account for Plaintiff's subjective allegations of tinnitus (Docket No. 17).

### B.  DEFENDANT'S RESPONSE

Defendant disagrees and argues that the ALJ gave appropriate weight to the opinions of

Plaintiff's treating physicians, Drs. Thombre and Woodhouse (Docket No. 18, p. 9 of 14). Defendant

also alleges that the ALJ complied with the regulations in finding Plaintiff not fully credible (Docket

No. 18, p. 11 of 14).

### C.  DISCUSSION

1.     TREATING PHYSICIAN RULE

    a.     DR. THOMBRE

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).
>
> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.
>
> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). ALJ Horton gave the opinion of Dr.

Thombre, Plaintiff's treating psychiatrist, less than controlling weight because "it is inconsistent with

her own treatment notes as well as the overall evidence of record. Further, it is based on the claimant's

23

subjective complaints, which in turn are based on a desire to make a record for anticipated litigation"
(Docket No. 12, p. 446 of 530).

ALJ Horton provides a detailed summary of Dr. Thombre's treatment of Plaintiff. As noted by
the ALJ, Plaintiff sought treatment from Dr. Thombre from November 2003 through September 2007
(Docket No. 12, pp. 274-314 of 530). Plaintiff's initial psychiatric evaluation revealed that Plaintiff
complained of depression, difficulty sleeping and concentrating, withdrawal, and decreased libido
(Docket No. 12, pp. 311-14 of 530). Based on her evaluation, Dr. Thombre found Plaintiff suffered
from severe depression, likely precipitated by his tinnitus (Docket No. 12, p. 313-14 of 530). By May
2007, Dr. Thombre opined that Plaintiff suffered from: (1) a psychological or behavioral abnormality
associated with a dysfunction of the brain; (2) a disturbance of mood, accompanied by a full or partial
manic or depressive syndrome; (3) generalized persistent anxiety; (4) a persistent irrational fear of a
specific object, activity, or situation which results in a desire to avoid that object, activity, or situation;
and (5) recurrent and intrusive recollections of a traumatic experience (Docket No. 12, pp. 255-59 of
530). In an accompanying assessment of Plaintiff's mental work-related limitations, Dr. Thombre
noted that Plaintiff suffered a variety of limitations, ranging from mild to marked in three categories:
(1) making occupational adjustments; (2) making performance adjustments; and (3) making personal
social adjustments (Docket No. 12, pp. 268-71 of 530). Based on these results, Dr. Thombre
determined that Plaintiff would be an unreliable worker, likely absent from work five or more days per
month (Docket No. 12, p. 272 of 530).

As noted by ALJ Horton, Dr. Thombre's treatment notes do not seem to support such a severe
diagnosis (Docket No. 12, p. 446 of 530). Plaintiff attended therapy sessions with Dr. Thombre
approximately every two weeks for nearly four years, although the sessions tapered off towards the

24

end (Docket No. 12, pp. 274-314 of 530). During this time, Plaintiff engaged in both individual therapy and couples' therapy with his wife (Docket No. 12, pp. 274-314 of 530). As ALJ Horton stated, Plaintiff's mental health symptoms "waxed and waned" (Docket No. 12, p. 445 of 530). At times, Plaintiff reported feeling better, even discussing going on vacation (Docket No. 12, pp. 275, 297 of 530), getting along better with his wife (Docket No. 12, pp. 290, 294, 296-97 of 530), looking for and moving to an island house in Michigan (Docket No. 12, pp. 284, 294 of 530), and possibly having a baby with his wife (Docket No. 12, p. 283 of 530). At other times, Plaintiff reported feeling depressed (Docket No. 12, pp. 280, 285-86, 291 of 530), and frustrated with his pending litigation (Docket No. 12, p. 299 of 530), Social Security application (Docket No. 12, pp. 280, 291 of 530), home life (Docket No. 12, p. 282 of 530), and treatment (Docket No. 12, p. 291 of 530).

Although the ALJ sets forth her "good reasons" for discounting Dr. Thombre's opinion, the stated  reasons fail to satisfy the Sixth Circuit requirement.  As stated by the Circuit, "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson*, 378 F.3d at 544). Not only did ALJ Horton fail to specifically state what weight she *was* assigning to Dr. Thombre's opinion, she also failed to note the frequency of examination and the nature and extent of their treatment relationship (Docket No. 12, pp. 438-50 of 530). Furthermore, while ALJ Horton did describe how Dr. Thombre's opinion varied from the doctor's own treatment records, the ALJ failed to set forth the general supportability for this opinion and its consistency with the *balance* of Plaintiff's medical records as a

25

whole (Docket No. 12, pp. 438 of 530).

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). As set forth by the Sixth Circuit, "[w]e do not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley*, 573 F.3d at 267.

Based on the ALJ's failure to abide by the requirements of the treating physician rule, this Magistrate must remand this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

### b.     DR. WOODHOUSE

Plaintiff also alleges that the ALJ failed to accord proper weight to the opinion of Dr. Woodhouse (Docket No. 17, pp. 14-16 of 22). According to a June 2010 Physical Residual Functional Capacity Assessment by Dr. Woodhouse, Plaintiff could only occasionally lift/carry less than ten pounds, frequently lift/carry less than ten pounds, and stand/walk less than two hours during an eight-hour day (Docket No. 12, pp. 494-95 of 530). Additionally, Plaintiff required a sit/stand option to relieve pain or discomfort, was limited in his lower extremities and in reaching, could only occasionally climb, kneel, crouch, crawl, and stoop, and never balance (Docket No. 12, pp. 495-96 of 530).

A claimant bears the ultimate burden of establishing his eligibility for Social Security benefits. *See Halsey v. Richardson*, 441 F.2d 1230, 1236 (6th Cir. 1971). To do this, a claimant must show that his disability results in an "inability to engage in any substantial gainful activity . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). This disability must be demonstrated through "medically acceptable clinical or laboratory findings." 42 U.S.C. § 423(d)(5)(A). The burden of compiling a complete record, "defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); *see also* 20 C.F.R. § 416.912(c). As stated above, this Court's "inquiry is limited to a determination of whether substantial evidence exists in the record to support the Secretary's decision and to a review for any legal errors. The determination of whether there is substantial evidence to support the Secretary's findings must be based on the record as a whole." *Landsaw*, 803 F.2d at 213 (internal citations omitted).

Here, Plaintiff's objective medical record is vast, but contains, aside from the June 2010 Physical Residual Functional Capacity Assessment, only six pages of medical records from Dr. Woodhouse (Docket No. 12, pp. 246-51 of 530). Of these six pages, some of the medical records are illegible (Docket No. 12, pp. 246-51 of 530). It is therefore impossible for this Court to make a determination as to whether or not there exists "substantial evidence" to support ALJ Horton's opinion with regard to Dr. Woodhouse. For this alone, Plaintiff's case must be remanded to the Commissioner.

However, *even if* this Court were able to make a proper determination regarding the ALJ's treatment of Dr. Woodhouse's opinion, remand is still necessary. As was the case with Dr. Thombre's opinion, ALJ Horton failed to properly assign weight, controlling or otherwise, to Dr. Woodhouse's

27

opinion. In her decision, ALJ Horton states "Dr. Woodhouse's residual functional capacity is not given controlling weight because it is not even consistent with his own treatment notes or the overall medical evidence of record" (Docket No. 12, p. 446 of 530). While this may be true, an ALJ still has the obligation to apply certain factors in the event that he or she does not assign the opinion of a claimant's treating physician controlling weight. *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(c). While ALJ Horton did mention the length of the treatment relationship between Plaintiff and Dr. Woodhouse, her remaining analysis is a mere generalization of Dr. Woodhouse's opinion.

ALJ Horton notes that Plaintiff sought treatment from Dr. Woodhouse beginning in September 2007, saw him again in November 2007, and then did not return for an appointment until February 2009 (Docket No. 12, p. 446 of 530). The ALJ notes the "paucity" of Dr. Woodhouse's treatment records and the "very tenuous treating relationship" between Dr. Woodhouse and the Plaintiff (Docket No. 12, p. 446 of 530). ALJ Horton concludes by saying that Dr. Woodhouse's opinion is not given controlling weight because it not consistent with either the doctor's own treatment notes or the objective medical evidence (Docket No. 12, p. 446 of 530). ALJ Horton's decision fails, however,  to describe the nature and extent of Plaintiff's treating relationship with Dr. Woodhouse (Docket No. 12, pp. 438-50 of 530). Furthermore,  the ALJ fails to  describe *how* Dr. Woodhouse's opinion is inconsistent with the balance of the record (Docket No. 12, pp. 438-50 of 530).

Based on the ALJ's failure to abide by the requirements of the treating physician rule, this Magistrate must remand this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). *Id.*

### 2.    CREDIBILITY

Plaintiff next alleges that the ALJ erroneously discredited his subjective statements and

allegations regarding his tinnitus (Docket No. 17, pp. 16-22 of 22). Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases, an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

Here, ALJ Horton accorded Plaintiff's subjective statements only partial credibility (Docket No. 12, pp. 440-41, 447 of 530). Although the ALJ found that Plaintiff did suffer an injury to his hearing in 2003 which caused Plaintiff to lose his hearing for approximately one week, ALJ Horton opined that Plaintiff's subjective allegations as to how much he was actually affected by this injury were not credible (Docket No. 12, pp. 440-41, 447-49 of 530). A review of Plaintiff's medical records

29

support this conclusion.

Plaintiff first presented to Dr. Bertka on February 5, 2003, complaining of hearing loss, ringing, and irritation in his left ear (Docket No. 12, p. 159 of 530). Dr. Bertka noted that Plaintiff had a slight reddening of his left ear canal, but examination of Plaintiff's right ear was completely normal (Docket No. 12, p. 159 of 530). On March 19, 2003, Plaintiff saw Dr. Winegar, who diagnosed Plaintiff with possible left ear high frequency hearing loss compatible with noise exposure (Docket No. 12, p. 170 of 530). Although Plaintiff continued to complain of hearing loss and ringing, his medical records begin to display some irregularities.

On November 20, 2003, Plaintiff returned to Dr. Winegar complaining of a nasal blockage with difficulty breathing (Docket No. 12, p. 166 of 530). It was noted at the time that Plaintiff wore a hearing aid in his right ear (Docket No. 12, p. 166 of 530). By February 4, 2005, when Plaintiff first saw Dr. VanderMeer, Plaintiff's right ear audio testing revealed hearing within normal limits and Plaintiff was noted to be wearing a hearing aid in his *left* ear (Docket No. 12, p. 165 of 530). During the 2007 administrative hearing, medical expert Dr. Miller noted that tinnitus is a condition that typically "waxes and wanes," unlike Plaintiff's allegations of constant ringing (Docket No. 12, p. 395 of 530). As noted by Dr. Bertka, there was concern "that there are a lot of symptoms and [the] symptoms that are still appearing are progressing, that seem out of proportion to the suspected initiation cause of an airplane ride that was noise" (Docket No. 12, p. 158 of 530).

Furthermore, Plaintiff's credibility with regard to his work history is questionable. Plaintiff testified that he had not worked since some time in 2003 (Docket No. 12, p. 375 of 530). When asked about whether or not he had his own business, Plaintiff testified, " Yes, I had . . . a small cheese booth up at the trade center that I started years ago, but it – my mom has worked that thing the whole time. I

30

haven't had any part of that" (Docket No. 12, p. 373 of 530). However, Plaintiff's other records indicate otherwise. On October 22, 2002, Plaintiff told Dr. Bertka that he had a deli business in Michigan (Docket No. 12, p. 161 of 530). During the initial interview with Ms. Loesch, Plaintiff stated that he owned a deli in Taylor, Michigan, as well as a resale business (Docket No. 12, p. 244 of 530). On October 3, 2005, Plaintiff told Ms. Loesch that he was thinking of incorporating the deli (Docket No. 12, p. 228 of 530). During a December 5, 2005, appointment with Ms. Loesch, Plaintiff noted that the "deli is ok," and stated that he was working as an advisor (Docket No. 12, p. 227 of 530). In November 2005, Plaintiff stated that he wanted to open a distributorship business and employ his sister (Docket No. 12, p. 228 of 530). By February 20, 2006, Plaintiff was stating that he wanted to open an Amish store (Docket No. 12, p. 226 of 530).

During his 2007 hearing, Plaintiff testified that he bought a boat for his father in 2006, using his father's money (Docket No. 12, p. 384 of 530). Plaintiff indicated that he did not work on restoring the boat and stated that he and his father only took the boat out one time (Docket No. 12, p. 385 of 530). However, in treatment notes from Ms. Loesch, dated June 26, 2006, Plaintiff stated that "he bought a boat and [was] fishing" (Docket No. 12, p. 224 of 530).

With regard to his depression, Plaintiff stated during the 2007 administrative hearing that "the medication doesn't even work for [him]" (Docket No. 12, p. 380 of 530). Plaintiff's mental health treatment records provide evidence to the contrary. Dr. Thombre first started Plaintiff on Wellburtrin in December 2003 (Docket No. 12, p. 309 of 530). By February 2004, Plaintiff was asking to try a different medication because the Wellbutrin was not working (Docket No. 12, p. 307 of 530). However, by March 2004, Plaintiff was asking to go back *on* the Wellbutrin, claiming that he liked the medication (Docket No. 12, p. 306 of 530). Plaintiff repeated this same pattern with Lamictal (Docket

31

No. 12, pp. 305, 307 of 530). In June 2004, Plaintiff confirmed that he was "functioning better" since being on Wellbutrin (Docket No. 12, p. 303 of 530). In March 2005, Plaintiff switched to Cymbalta to help manage his depression (Docket No. 12, p. 296 of 530). He was also started on Prozac (Docket No. 12, p. 294 of 530). In September 2005, Plaintiff reported that "Prozac has done well for him," stating that he was more relaxed and talkative and less irritable (Docket No. 12, p. 290 of 530). In March and May 2007, Plaintiff reported feeling better on the Cymbalta (Docket No. 12, pp. 276, 278 of 530).

Based on a complete review of the record, it is clear that Plaintiff's credibility is less than perfect. Therefore, Plaintiff's second assignment of error is without merit and the Magistrate recommends that the ALJ's decision as to this issue be affirmed.

## VIII.  CONCLUSION

For the foregoing reasons, this matter is remanded to the Commissioner to consider the medical source opinions of Drs. Thombre and Woodhouse and articulate the weight accorded to this evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The decision of the Commissioner with regard to Plaintiff's second assignment of error concerning Plaintiff's credibility is affirmed.

**IT IS SO ORDERED.**


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   April 2, 2013

32